UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

LASHANETTE J. KEELS,

                    Plaintiff,           Civil Action No.: 14-12057
                                       Honorable Sean F. Cox
          v.                    Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 13]

Plaintiff Lashanette J. Keels ("Keels") brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Keels is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [13] be DENIED, Keels' motion [11] be GRANTED IN PART to the extent it seeks remand, and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Recommendation.

II.    **REPORT**

    A.    **Procedural History**

On November 11, 2011, Keels filed an application for DIB, alleging disability as of July 9, 2009. [Tr. 48]. The claim was denied initially on February 22, 2012. [Tr. 65-68]. Thereafter, Keels filed a timely request for an administrative hearing, which was held on March 5, 2013, before ALJ Henry Perez, Jr. [Tr. 24-47]. Keels, represented by attorney Kenneth Laritz, testified, as did vocational expert ("VE") Annette Kay Holder. [Tr. 24-47]. On March 26, 2013, the ALJ found Keels not disabled. [Tr. 8-20]. On May 16, 2014, the Appeals Council denied review. [Tr. 1-4]. Keels filed for judicial review of the final decision on May 22, 2014. [1].

    B.    **Framework for Disability Determinations**

Under the Act, DIB is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C.    Background

#### 1.    Keels' Testimony and Subjective Reports

Keels, age 37 at the time of application, alleges disability based on the following conditions: back injury; right knee injury; depression; and nerve damage.  [Tr. 102, 132].  She testified in her hearing before the ALJ that her right knee "goes out completely" on occasion, resulting in "constant pain" and throbbing.  [Tr. 28].  Keels stated that she underwent two surgeries in 2010 in an attempt to correct these issues, but that they were unsuccessful in remedying her knee pain.  [*Id.*].  She asserted that her knee pain typically registers at a ten out of ten, but pain medication reduces the pain to approximately seven out of ten.  [Tr. 28-29].  She claimed that she takes pain medication only about twice weekly because it puts her to sleep, thus reducing her ability to function.  [Tr. 29].

Keels further testified that walking, particularly on stairs, causes her knee to swell and renders it "done."  [*Id.*].  She described being able to stand for approximately one hour, and walk

3

for approximately one-half block before swelling takes hold; she elevates and applies ice to her knee when this type of swelling occurs. [Tr. 30]. She stated that this swelling can last between 20 minutes and several days. [Tr. 30]. Keels described occasional use of a knee brace and consistent use of a cane. [Tr. 31]. She stated that injections to the knee provided relief for approximately one month. [*Id.*].

Regarding back pain, Keels testified that she generally experiences pain at about the belt area, which radiates down into her right leg, resulting in occasional numbness to her entire right side. [Tr. 32]. She stated that this sort of pain would prevent her from even walking down the street. [Tr. 33]. Keels also stated that her back pain is sometimes so severe that she is unable to lift a gallon of milk. [Tr. 38].

Keels stated that she experiences headaches three to four times per week, which approximately twice per week are so severe that she must avoid all light and sound. [Tr. 34]. She also asserted that her blood pressure is at "stroke level" despite taking blood pressure control medication. [*Id.*].

Regarding psychological symptoms, Keels stated that inquiries from others about her wellbeing can bring on fits of depression and crying, which occurred during her psychological evaluation performed at the request of the Social Security Administration. [Tr. 34]. She also recounted experiencing panic attacks twice weekly even while at home because of her constant knee and back pain. [Tr. 35]. Keels stated that in a week, approximately two to three days would be categorized as "good days," where she experiences only mild back and knee pain. [Tr. 36]. She also stated that her back and knee pain prevent her from sleeping at night, and that she instead sleeps for a few hours during the daytime. [Tr. 37]. Finally, she recounted not undergoing treatment for any psychological problems at the time of the hearing, having never

4

been hospitalized for such treatment, and using only anti-depressant medications to treat her psychological issues.  [Tr. 40].

Keels also completed a function report dated December 26, 2011.  [Tr. 156-63].  In that report, Keels stated that her injuries prevent her from standing for long periods of time or walking for longer than 10 minutes, that she experiences frequent headaches, is in constant pain, and has difficulty bending and lifting.  [Tr. 156, 161].  She reported that she spends her days reading, resting, and helping her son with homework, which are hampered by fatigue due to her medication, and said that she is no longer able to pursue any hobby which requires moving around.  [Tr. 157, 160].  Keels further reported that her sleep is regularly interrupted by pain from her leg and back, and headaches.  [*Id.*].  This pain causes her difficulty with showering and bathing.  [*Id.*].  She performs no housework because of back and leg pain, and infrequently cooks simple meals.  [Tr. 158-59].  She reported rarely leaving home because her "knee goes out" such that she is unable to put pressure on it, because of swelling in her right knee, and because of shooting pain in that knee.  [Tr. 159].  She reported shopping monthly for about an hour.  [Tr. 159].  With regard to her mental health, Keels reported that she has regular emotional breakdowns, and spends little time with others.  [Tr. 160, 162].  Regarding medication, Keels reported that Elavil caused "tiredness, vomiting, [and] makes me feel like I'm going crazy."  [Tr. 163].  Finally, she reported being hopeless, depressed, and upset because of her ailments, and reiterated that she experiences "severe pain daily."  [*Id.*].

Also on December 26, 2011, Keels' husband completed a third party function report in which he generally corroborated her assertions.  [Tr. 140-47].

2.     *Medical Evidence*

a.     *Treating Sources*

Keels' first available medical records reflect a July 6, 2009 visit to Botsford Hospital following her involvement in a motor vehicle accident. [Tr. 258]. She was treated by Amanda Winter, D.O., who recorded that Keels complained of a headache, chest pain where her seatbelt was located, and low back pain. [Tr. 235]. Dr. Winter further recorded that Keels could not remember anything after the accident until a police officer approached her vehicle, but was ambulatory at the scene of the accident. [*Id*.]. Keels denied experiencing pain in her extremities at the time of her initial examination. [*Id*.]. Dr. Winter noted that Keels felt pain upon palpitation of the lumbar spine, and ordered numerous radiological tests. [Tr. 235-237].

A CT scan of Keels' cervical spine found normal results. [Tr. 244]. A CT scan of her lumbar spine showed anterior angulation of the coccyx, but with no acute osseous abnormality. [*Id.*]. A CT scan of Keels' brain showed no evidence of soft tissue swelling or depressed skull fracture, hemorrhage, midline shift, or mass effect, but did show calcification of the left basal ganglia. [Tr. 246]. She was diagnosed with a concussion. [Tr. 260]. She was prescribed Motrin, Valium, and Vicodin for pain management and was discharged from the hospital on July 6, 2009. [Tr. 255].

On August 26, 2009, Keels was examined by Dr. Stephen Pomeranz, who performed an MRI on her right knee. [Tr. 268]. Dr. Pomeranz found "[e]arly and predominantly intrameniscal tear of the posteromedial body-horn junction associated with premature degeneration of the femorotibial articulation with flattening of the tibia and scuffing and early chondromalacia," but with "no major traumatic macro meniscus tear or unstable meniscus injury." [Tr. 268-69].

On September 11, 2009, Keels sought treatment from Dr. Jeffrey Parker for headaches,

6

memory loss, bilateral knee pain, anterior chest pain, and radiating back pain. [Tr. 310-11]. Keels reported difficulty performing household chores, caring for children, recreational activities, as well as some pain when twisting, bending, kneeling, or crawling. [*Id*.]. Dr. Parker found that Keels experienced pain on deep palpation of the lateral compartment of the right and left knee, but that Keels had a full range of motion in both knees, and found no fluid on either knee. [Tr. 312]. Dr. Parker ruled out a closed head injury and lumbar radiculopathy, and found that Keels suffered from lumbar sprain. [*Id*.]. Dr. Parker concluded by finding that Keels was disabled from work and household activities for at least a month when she was to be re-evaluated. [Tr. 313].

At Dr. Parker's recommendation, Keels underwent radiological testing on September 18, 2009. [Tr. 277]. Keels again reported spine pain radiating downward into her legs, with occasional tingling in the right foot. [*Id*.]. An MRI was performed on Keels' lumbar spine, which Dr. Vivek Seghal interpreted as showing a "[d]iffuse disc bulge and annual tear and central disc protrusion at L5/S1 without stenosis." [Tr. 278-79].

A tomographic scan was performed on Keels' brain at Oakwood Hospital and Medical Center on September 21, 2009. [Tr. 203]. Dr. Reza Abghari found this scan showed "irregularity of perfusion within both hemispheres" with decreased activity in the left hemisphere, possibly related to brain trauma, contusion, ischemic changes, or asymmetric cortical atrophy. [Tr. 203].

On October 9, 2009, Keels was again seen by Dr. Parker, who noted a full range of motion in her cervical spine, with 30 degree flexion of the lumber spine, lateral rotation at 30 degrees, and 10 degrees in extension. [Tr. 309]. He found no fluid on the right knee, but Keels experienced pain on deep palpitation of the lateral and medial compartments of the right knee.

[*Id*.].   Dr. Parker's report referenced the recent findings of Drs. Seghal and Abghari, and, contrary to his earlier findings, he diagnosed Keels with a closed head injury and lumbar disc disease.  [*Id*.].   Dr. Parker made similar findings during Keels' visit to his office on November 6, 2009, except that he also noted +1 edema on the right knee, and that Keels began using a cane for support.  [Tr. 308].   Dr. Parker noted that Keels was scheduled for knee surgery.  [*Id*.].

On January 15, 2010, Kevin Crawford, D.O., performed an arthroscopy surgery on Keels' right knee.  [Tr. 198-99].   Dr. Crawford found that Keels had a "small undersurface tear of the posterior horn of the medial meniscus," which he "resected [] until a smooth and integrous margin of meniscus was obtained."  [Tr. 199].

After her knee surgery, Keels began seeing Dr. Parker again, complaining that her right knee was swollen and painful.  In office notes dated February 5 and March 19, 2010, Dr. Parker noted that Keels was markedly unstable when walking (he found that she was putting 90% of her weight on her left leg), and had swelling on the right leg.  [Tr. 306-07].  A straight leg raising test was positive on the right.  [*Id*.].   Dr. Parker prescribed an anti-inflammatory medication.  [Tr. 306-07].

On April 8, 2010, Dr. Pomeranz examined a new MRI of Keels' right knee, which he found demonstrated "interval partial medial meniscectomy" and "irregularity of the posterior horn and body remnant," which he attributed to a "residual or recurrent tear."  [Tr. 266-67].   He also noted marrow hyperintensity in the patella, femur, and tibia, which he found were not present in Keels' prior MRI.  [*Id*.].   Keels then saw Dr. Parker on April 23, 2010, and he again found that she had "marked instability" and swelling in her right knee.  [Tr. 305].

Dr. Crawford performed a second arthroscopic surgery on Keels' right knee on May 14, 2010.  [Tr. 193-97].   His post-surgery notes reflect mostly normal findings except that in the

8

posterior medial corner he found "a small area where there was some fraying and a very minute radial tear" which was trimmed smooth. [Tr. 196].

Dr. Parker re-evaluated Keels on June 25, July 23, and September 3 of 2010. [Tr. 302-04]. At the June 25th visit, Keels indicated a belief that the second knee surgery "helped her," though Dr. Parker still found her to exhibit marked instability in the right knee. [Tr. 304]. Dr. Parker found scar tissue forming over the incision point on her right knee and continued her anti-inflammatory medication. Keels' optimism about the impact of the second surgery on her knee did not last long. [*Id.*]. At her July 23, 2010 visit with Dr. Parker, Keels "continue[d] to complain of pain in her right knee and back … [and] is slightly depressed due to her knee pain." [Tr. 303]. Dr. Parker found that Keels' right knee was swollen, and that he could not properly evaluate her lumbar spine "due to right knee pain and instability." [*Id.*]. At the September 3, 2010 visit with Dr. Parker, Keels reported that she had temporarily stopped attending physical therapy because of knee pain. [Tr. 302]. Dr. Parker's findings were similar to his prior ones. [*Id.*].

Keels underwent a whole body scan on September 14, 2010, which was evaluated by Dr. Reza Abghari. [Tr. 201]. He noted mild to moderate increased activity in Keels' knee which he attributed to either arthritis, trauma, or prior surgery. [*Id.*].

On October 8, 2010, Dr. Parker recorded that Keels' spine had a lumbar disc bulge, annular tear, and disc protrusion at L5-S1. [Tr. 301]. These findings were duplicated in a November 5, 2010 visit, though a notation indicates that Keels felt that her knee had "slightly improved." [Tr. 300]. Again, any improvement seems short-lived; at a December 11, 2010 visit with Dr. Parker, Keels reported that she had again developed pain and swelling in her right knee. [Tr. 299]. Dr. Parker found +2 edema and +1 heat in a study of Keels' right knee. [*Id.*].

Also on December 11, 2010, Keels underwent an MRI of her right knee, which Dr. Pomeranz found contained postmeniscetomy changes of the medial meniscus without recurrent tear, a small effusion, and a pattern of stippled edema.  [Tr. 264].

Dr. Parker found a reduced level of +1 edema on Keels' right knee during a January 14, 2011 examination.  [Tr. 298].  Dr. Parker noted that she had been prescribed Lyrica to address swelling in her right knee.  [*Id.*].  Physical therapy, which Keels used intermittently during her post-surgery recovery period, caused swelling which Dr. Parker noted during a May 6, 2011, visit.  [Tr. 295].  The physical therapy did not resolve Keels' instability and radiating back and leg pain, which she expressed to Dr. Parker during office visits on June 3, 2011, and July 1, 2011.  [Tr. 293-94].

On July 7, 2011, Keels visited Dr. Craig Peppler for a pain consultation.  [Tr. 288-92]. Dr. Peppler noted that Keels had difficulty walking, used a cane, and was unable to lift more than ten pounds.  [Tr. 290].  Keels reported that even light activity caused swelling in her knee.  Dr. Peppler concluded that Keels had intractable right knee pain and probable right S1 radiculopathy. [Tr. 291].  He recommended the following restrictions:

> [A]voiding prolonged standing and walking.  She should avoid bending and twisting at the waist and knee.  She is not to lift, push, or pull more than 7 to 10 lbs.  She is not to engage in any kneeling or squatting activities.  She must be allowed to change positions frequently as necessary for her pain and to apply ice as necessary for symptomatic treatment, as well.

[Tr. 292].

During three subsequent visits on August 5, September 2, and October 7 of 2011, Dr. Parker noted +1 edema of Keels' right knee but a full range of motion in that joint.  [Tr. 285-87]. As he had done throughout his treating relationship with Keels, Dr. Parker continued to opine that Keels was completely disabled.  [*Id.*].

10

On October 9, 2011, an MRI of Keels' spine was performed by Dr. Michael Paley at the Bio-Magnetic Imaging Centers. [273-74]. Dr. Paley found "[i]nterval development of a bulging disc at L4-L5" with "bilateral foraminal stenosis" and a "[h]erniated disc with annular tear at L5-S1 without significant change." [*Id.*].

On October 20, 2011, Keels again visited Dr. Peppler, who noted that pain medication was not helpful in treating Keels' knee pain, and that she limped favoring the right leg. [Tr. 283-84]. He ruled out radiculopathy. [*Id.*].

On December 2, 2011, after referencing Dr. Paley's findings, Dr. Parker altered his prior diagnosis to include lumbar radiculopathy. [Tr. 282].

Dr. Peppler again evaluated Keels on February 9, 2012. [Tr. 320-22]. He stated that the MRI of Keels' spine showed "extension of the previously noted disc protrusion." [Tr. 320]. Keels reported to Dr. Peppler that she was unable to tolerate the pain medication Cymbalta, but that she "did have a series of Euflexxa injections and did quite well with them, but that has now worn off. She would like to consider having additional injections performed." [*Id.*]. Keels reported that her knee "[gave] out frequently" making her "afraid to navigate stairways," and had "fallen several times and has decided that she no longer will trust her knee." [*Id.*]. Keels also stated that she suffered frequent migraine headaches and slept little at night; she avoided taking Elavil for her headaches because of potential side effects. [*Id.*]. He again opined that Keels was disabled, and noted that she required a care attendant for two hours daily. [*Id.*]. Keels again requested Euflexxa injections in a March 8, 2012 visit. [Tr. 319]. During that visit, Dr. Peppler noted a "positive McMurray's sign" on her right knee and "slight knee effusion." [*Id.*].

  *b.*    *Consultative and Non-Examining Sources*

On February 10, 2012, Keels underwent a consultative psychological examination

11

performed by Suzann Kenna, L.L.P. of HCC Evaluations, LLC.  [Tr. 315-18].  Keels reported depression, memory problems, and difficulty sleeping at night.  [*Id*.].  Keels stated that she drives her children to school, but requires help to perform simple tasks like showering because of her knee pain and swelling.  [Tr. 316].  Kenna noted that Keels used a knee brace and cane.  [*Id*.].  Kenna found that Keels' speech was spontaneous, logical, organized, but that her motor activity was retarded.  [*Id*.].  Keels cried during interview, and reported regular crying spells and panic attacks in addition to occasional suicidal thoughts.  [*Id*.].  Keels was able to recite nine numbers forward and five backward, and was able to recall three out of three objects.  [*Id*.].  Kenna concluded that, given Keels' "present emotional condition of crying all the time and not wanting to leave the house, she would not be able to do work related activities," and assigned a GAF of 45.  [Tr. 317].

On January 24, 2012, Dr. Milagros Flores reviewed Keels' medical records to date as a consultative physician for the Commissioner.  [Tr. 48-61].  She opined that Keels was capable of frequently lifting 10 pounds, pushing or pulling an unlimited amount, standing or walking for two hours and sitting for six hours in an eight-hour workday.  [Tr. 57].  She further stated that Keels could climb ramps, stairs, ladders, ropes or scaffolding occasionally, and balance, stoop, crouch, crawl or kneel occasionally.  [Tr. 57-58].

In that same report, James Tripp, ED. D., evaluated Keels' mental residual functional capacity.  [Tr. 58-60].  He found that she was moderately limited in terms of her ability to remember, understand, and carry out detailed instructions [Tr. 58-59], to interact with the public [Tr. 59], and to respond to changes in work setting and travel to unfamiliar places or use public transportation [Tr. 60].  Tripp concluded that Keels' alleged limitations were partially credible, and that she was able to complete "simple, concrete 2-3 step routine repetitive tasks with

sustainibgility [sic] and persistence.  The claimant is able to briefly and superficially interact with oithers [sic] in the workplace."  [*Id*.].

### 3. *Vocational Expert's Testimony*

The VE characterized Keels' past work as a human resources assistant as semiskilled, and performed at a sedentary to light level of exertion; her work as an administrative clerk was also semiskilled, and was performed at the light to medium level of exertion.  [Tr. 41-42].  According to the VE, Keels acquired clerical skills in those positions which would transfer to sedentary work, thus rendering Keels eligible to work as a general office clerk, a semiskilled position at the sedentary level with 5,000 jobs in Southeast Michigan; and information clerk, a semiskilled sedentary position with 4,000 jobs in that region.  [Tr. 42].  Next, the ALJ asked the VE to assume a claimant of Keels' age, education, and work experience, who can perform sedentary, unskilled work, but who is limited to sitting for six hours and standing or walking for two hours in an eight-hour workday; who can occasionally climb, balance, crouch, kneel, and crawl; who can perform simple, concrete frequent two to three-step routine, repetitive tasks; and who can briefly and superficially interact with others.  [Tr. 43].  The VE testified that such a worker could not perform any of Keels' past work, nor any position to which her skills would transfer.  [*Id*.]. However, the VE testified that such a worker could perform the sedentary unskilled positions of assembler (1,600 positions in Southeast Michigan), sorter (1,200 jobs), and packer (1,500 jobs). [Tr. 43-44].  The ALJ then asked a second hypothetical, including all of the prior restrictions and adding that the worker would be "constantly crying and not wanting to leave her home," but who could work at a semiskilled level.  [Tr. 44].  The VE testified that such restrictions would preclude all competitive employment.  [*Id*.].  The VE further testified that Keels' alleged headache symptoms and the need to lie down and isolate herself would also preclude competitive

13

employment, as would the need to elevate her leg at waist level, her inability to focus because of pain, and her inability to focus due to sleepiness resulting from her medications.  [Tr. 44-45].

Keels' attorney then asked the VE whether the use of a cane to ambulate would preclude employment in the jobs described above, and she testified that it would not.  [Tr. 45-46]. However, the VE asserted that the use of a cane to stand would preclude work as an assembler or packager, and would reduce the number of sorter positions available in Southeast Michigan to approximately 600.  [Tr. 46].  Finally, the VE testified that each of these positions would have a quota, and that the worker would be expected to remain on task for 85 percent of the workday. [Tr. 46-47].

### D.    The ALJ's Findings

Following the five step sequential analysis, the ALJ determined that Keels was not disabled.  [Tr. 11].  At Step One, he found that Keels had not engaged in substantial gainful activity since her alleged onset date.  [Tr. 13].  At Step Two, he found the following severe impairments:  status post two right knee arthroscopies with tendonitis and recurrent inflammation; lumbar degenerative disc disease with radiculopathy; headaches; closed head injury; major depressive disorder; and panic disorder.  [*Id.*].

At Step Three he concluded that none of Keels' severe impairments, either alone or in combination, met or medically equaled a listed impairment.  [Tr. 13-14].  The ALJ next assessed Keels' RFC, finding her capable of performing sedentary work with the following restrictions: she can lift and carry ten pounds occasionally; she can sit six hours in an eight-hour workday, and can stand and/or walk two hours in an eight-hour workday; she can occasionally climb, balance, kneel, crouch, and crawl; she can frequently stoop; she is limited to simple, concrete, two to three step routine and repetitive tasks; and she can briefly and superficially interact with

14

others in the workplace.  [Tr. 15].  In making this determination, the ALJ gave great weight to Dr. Flores' assessment regarding Keels' lifting, standing, and walking limitations, and great weight to mental consultative examiner Tripp who found that Keels could sustain concrete, two or three step, routine, repetitive tasks.  [Tr. 17].

The ALJ assigned limited weight to the mental RFC assessment of the consultative psychological examiner L.L.P. Kenna, finding that his assessment that Keels' crying and desire not to leave the house would preclude any work was not supported by treatment records.  [Tr. 17-18].  He also assigned limited weight to the opinions of Drs. Parker and Peppler because of their inconsistency with the opinions of Tripp and Dr. Flores.  [Tr. 17].  The ALJ gave some weight to Keels' husband's Third Party Function Report, in which he reported that Keels is incapable of standing for long periods of time, experiences back pain neck pain and headaches, and requires assistance in performing tasks around the house.  [Tr. 18].

At Step Four, the ALJ found that, based on this RFC, Keels could not perform her past relevant work.  [Tr. 18].  However, at Step Five, the ALJ concluded that, based on the testimony of the VE, Keels could still perform a number of jobs in the national economy, including assembler (1,600 jobs in Southeast Michigan), sorter (1,200 jobs) and packer (1,500 jobs).  [Tr. 19].

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d

591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).   Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."   *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).   There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide

the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.      Analysis**

Keels argues that the ALJ erred in four respects, by failing to: 1) give appropriate deference to the opinions of Drs. Peppler and Parker with regard to the severity of her knee condition; 2) properly account for her psychological and certain postural limitations; 3) account for restrictions relating to back pain and headaches; and 4) give the proper weight to the consultative psychological examiner's opinion.  The Court addresses these arguments in turn.

*1.      The Weight Given by the ALJ to the Opinions of Drs. Peppler and Parker, and His Limitation of Keels to "Occasional" Kneeling, is Not Supported by Substantial Evidence*

Keels argues that the ALJ failed to give proper weight to the opinions of Drs. Parker and Peppler, including Dr. Peppler's conclusion that she was precluded from "any kneeling."  [Tr. 292].  Under the "treating physician rule," an ALJ must give controlling weight to a treating physician's opinion when that opinion is well supported by evidence and is not inconsistent with other substantial evidence of record.  20 C.F.R. § 404.1527(c)(2).  If an ALJ does not give controlling weight to a treating physician's opinion, he must determine how much weight it should be accorded based "a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also* 20 C.F.R. § 404.1527(c).  While an ALJ is not required to specifically address each of these factors, he still must provide "good reasons" for the weight given to a

treating physician's opinion.  *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir.

2011).  Here, the ALJ's decision to reject the opinion of Dr. Peppler restricting Keels from "any

kneeling," and to instead limit her to "occasional" kneeling, is not supported by "good reasons."

In support of his decision on this point, the ALJ seemed to rely heavily on the fact that,

shortly after her second surgery, Keels reported to Dr. Parker that the procedure had "helped

her."  [Tr. 16, 17, 304].  He also focused on Dr. Parker's findings that Keels was often found to

have a full range of motion in her right knee, and that a 2010 MRI showed "no tear and only a

small effusion" in that knee.  [Tr. 16, Tr. 264, 296-301].  Finally, the ALJ gave "great weight" to

Dr. Flores' findings that Keels could engage in occasional kneeling because he found that

"[g]reater restrictions are not warranted by the treatment notes."  [Tr. 17, 57].

First, while the ALJ correctly notes that Keels, shortly after her second knee surgery, told

Dr. Parker that she believed that surgery had "helped" her right knee condition, Dr. Parker

indicated in the very same note that it was difficult to examine Keels "because of marked

instability of the right knee…"  [Tr. 304].  Moreover, the one-time noted improvement appears to

be more of an outlier, rather than an indicator of actual progress, as the ALJ interpreted it to be.

Indeed, in the very first treatment note after Keels' comment about improvement, Dr. Parker

noted that her "right knee is swollen," and Keels "continue[d] to complain of pain in her right

knee…" and reported being depressed due to that pain.  [Tr. 303].  Her anti-inflammatory

medications were continued at the time.  [*Id.*].  Dr. Parker's next note indicates that Keels'

physical therapy was discontinued because of "increasing pain," and that he was referring her to

"another orthopedic surgeon concerning her knee problems."  [Tr. 302].  A few months later, Dr.

Parker noted a "+2 edema of the right knee versus the left," and that due to continued pain and

swelling in her knee, her orthopedic surgeon "indicated she should stop physical therapy and

18

ordered an MRI of her right knee." [Tr. 299]. After another month, Keels had received injections in her knee, but had "still not been released by her orthopedic surgeon to restart physical therapy…" [Tr. 298]. She was diagnosed with "+1 edema of the right knee versus the left," and "Recurrent inflammatory response of the right knee." [*Id.*]. Dr. Parker made similar findings for months thereafter. [Tr. 285-86, 293-95]. Additionally, the Court notes that while a December 2010 MRI showed no "recurrent tear" [Tr. 264], the ALJ fails to discuss Dr. Peppler's March 15, 2012 finding that Keels' right knee showed a positive response for the McMurray's sign, indicating a possible meniscal tear. [Tr. 319]; *see also Stedman's Medical Dictionary* (26th ed.1998) at 1780. Such a tear would be consistent with Keels' longstanding and ongoing complaints of unresolved knee pain and the records discussed herein.

Dr. Parker's findings that Keels regularly exhibited full range of motion in her right knee are not necessarily inconsistent with her repeated complaints of severe pain, limping, swelling, and collapsing. [Tr. 16]. Indeed, as discussed above, in the very same records that Dr. Parker noted good range of motion, he also consistently found that Keels had knee swelling, knee stability issues, and severe knee pain that did not respond well to medication. The ALJ erred by failing to fairly weigh all of that evidence against the evidence that Keels' knee was found to have full range of motion. The Court also notes that Dr. Peppler examined Keels five times over a period of approximately eight months, and repeatedly found that her right knee was seriously impaired, and considered numerous intensive courses of treatment, including surgery.

Similarly, the ALJ has not adequately explained his reasoning that Dr. Flores' finding that Keels could engage in occasional kneeling was entitled to "great weight" because "[g]reater restrictions are not warranted by the treatment notes." [Tr. 17]. That conclusion is not supported by substantial evidence because, for the reasons noted above, the ALJ did not adequately discuss

19

the medical records from Keels' treating physicians with respect to her knee impairments.

In sum, because the Court finds that the ALJ did not fairly weigh the bulk of the treating physician notes against the *one* where Keels noted improvement in her knee, the Court cannot find that the ALJ gave "good reasons" for rejecting Dr. Peppler's opinion that Keels could not engage in any kneeling activities.   Accordingly, remand is warranted for a more thorough evaluation of the treating physician records with respect to Keels' knee impairment.[1]

> 2.    *The ALJ's RFC Adequately Accounted for Keels' Psychological and Certain Postural Limitations*

Keels also argues that the ALJ erred by failing to include in his RFC finding several necessary limitations resulting from certain psychological and postural ailments.  First, Keels asserts that the ALJ's finding that she can briefly and superficially interact with others in the workplace is inconsistent with the mental requirements for successful completion of competitive, remunerative, unskilled employment as set forth by Social Security Ruling 96-9p.  That ruling provides that unskilled employment entails "responding appropriately to supervisors, co-workers and usual work situations."  [11 at 10].  Thus, Keels argues, she is incapable of completing even unskilled work.  [*Id*.].  This interpretation of Ruling 96-9p is incorrect.  In cases where medical evidence demonstrates that a claimant has suffered a degradation of the abilities necessary to

---

[1] The ALJ also failed to properly consider other important factors that bear on Keels' knee impairment.  Social Security Ruling ("SSR") 96–7p provides that, in addition to the objective medical evidence, additional factors should be considered in evaluating the credibility of an individual's complaints of pain, including: prior work record; daily activities; the location, duration, frequency, and intensity of pain or other symptoms; and the type, dosage, effectiveness, and side effects of medication.  *See* Soc. Sec. Rul. 96–7p, 1996 WL 374186, at *1–3 (July 2, 1996). On remand, the ALJ should consider Keels' prior work record (including her extensive work history up until she was injured in the 2009 car accident), and the consistent reports and testimony of serious side effects from her medications and their limited effectiveness.  [Tr. 28-29 (testifying that "The medicine usually makes me drowsy and knocks me out…I haven't had any medication that has actually taken the pain away.  It may drop the pain down to like a seven [out of ten]."), 157-160, 283-84, 320].

complete unskilled work, the ALJ is not required to find the claimant disabled, but rather is required to consult a vocational expert. *See Campbell v. Comm'r of Soc. Sec.*, No. 08-11651, 2009 WL 2777718, at *4 (E.D. Mich. Aug. 27, 2009). Here, the ALJ properly consulted a VE, who testified that a worker who was limited to brief and superficial interactions with others in the workplace would not be precluded from performing the jobs of assembler, sorter, and packer. [Tr. 40-47].

Keels next argues that the ALJ's RFC finding did not

> rate the plaintiff's ability to function independently or effectively on a sustained basis. . . . [or] assess the amount of supervision or assistance required by the plaintiff. . . . [and that a] review of the ALJ's hypothetical questions posed to the [VE] clearly demonstrates that they did not describe in any meaningful way the plaintiff's ability to sustain concentration, persistence or pace other than to state a conclusion that she could do simple, concrete frequent two to three step routine, repetitive tasks.

[11 at 11]. Although Keels couches this as a challenge to ALJ's questions to the VE, it is more appropriately understood as a challenge to the ALJ's RFC finding. *See Kirchner v. Colvin*, 2013 WL 5913972, at *11 (E.D. Mich. Nov.4, 2013) (holding that "[plaintiff's] Step Five argument is a veiled attack on the ALJ's underlying RFC finding" because "this is not a scenario where the ALJ's hypothetical failed to match up to the RFC he ultimately imposed."). Keels thus argues that the concentration, persistence and pace ("CPP") restrictions included by the ALJ in his RFC[2] did not properly reflect the limitations to her ability to work on a sustained basis, the amount of supervision she requires, or her ability to maintain concentration, persistence, or pace. [11 at 11].

---

[2] As noted above, the ALJ found that Keels is capable of sedentary work with a number of further restrictions, including that she is limited to simple, concrete, two to three step routine and repetitive tasks; and she can briefly and superficially interact with others in the workplace. [Tr. 15].

21

Regarding Keels' ability to work on a sustained basis, the concept of an RFC by definition incorporates the ability of a claimant to "perform sustained work on a regular and continuing basis; i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule" after taking the claimant's determinable limitations into consideration.  *See* SSR 96-9p.  It is thus unnecessary for the ALJ to include a separate statement that Keels is able to perform work on a sustained basis.  As to her ability to work without supervision, Keels cites no medical evidence or statutory language supporting the need for such a restriction.  Keels similarly fails to provide any support for her claim that the CPP restrictions included by the ALJ were insufficient to encompass her actual limitations in those areas.  Courts have regularly found that claimants who, like Keels, are found to have only moderate CPP limitations [Tr. 14] were adequately accommodated by a limitation to simple, unskilled one, two, or three-step work like the one the ALJ imposed here.  *See Anderson v. Comm'r of Soc. Sec.*, No. 12-CV-13066, 2013 WL 3285220, at *16 n.5 (E.D. Mich. June 28, 2013).

> 3. *The ALJ Did Not Err by Discounting Keels' Alleged Limitations Due to Back Pain and Headaches*

Keels next argues that the ALJ erred by failing to account in his RFC finding for the limitations she allegedly suffers as a result of her back pain and headaches.  [11 at 13].  In support of her claims of back pain, Keels points to a comparison of MRI testing on her back from September 2009 and November 2011 which shows the "interval development of bilateral foraminal stenosis at L4-5."  [*Id*.; Tr. 272-274].  In his decision, the ALJ noted that in September 2009 Keels was found to suffer from radiating back pain that caused occasional numbness, a diffuse disc bulge and annular tear and central disc protrusion at L5-S1 without stenosis.  [Tr. 16].  He also noted that a November 2011 MRI of Keels' spine showed "interval development of a bulging disc at L4-L5 with bilateral foraminal stenosis and a herniated disc with annular tear at

L5-S1.  She was diagnosed with lumbar disc disease with radiculopathy."  [*Id.*].  The ALJ also found that Keels continued to seek treatment for back pain through 2012, though her reported pain and limitations did not compare to those reported in relation to her right knee.  [Tr. 17].  He further found that Keels treated her back pain conservatively with medication, and that her treatment for back pain has been relatively infrequent.  [*Id.*].[3]  These constitute good reasons for finding that Keels' complaints of disabling back pain are not entirely credible.  Regardless, Keels failed to identify any necessary back-related restrictions which the ALJ failed to include in the RFC.  She also failed to explain why the restrictions imposed by the ALJ would be insufficient to account for her back-related limitations.

The ALJ found that Keels' complaints of headaches were infrequent, and that she treated her headaches conservatively.  [Tr. 17].  Keels testified during the hearing that she experiences headaches three to four times per week, which are sometimes so severe that she must avoid light and sound.  [Tr. 34].  These complaints are reflected in treatment notes created following her July 6, 2009 car accident [Tr. 235], and by Dr. Peppler on February 9, 2012  [Tr. 320].  Keels was hesitant to take medication to treat these headaches because of fears of potential side effects, prompting Dr. Peppler to "talk with her extensively" about dose titration and "urged her to give it a try."  [Tr. 321].  Given this sparse and hesitant treatment history, the ALJ provided good reasons supporting his decision to not fully credit Keels' headache complaints.  [Tr. 17].

    4. *The ALJ Did Not Err by Giving Little Weight to L.L.P. Kenna's Mental RFC Assessment*

Finally, Keels argues that the ALJ failed to give sufficient weight to the opinion of the consultative psychological examiner, L.L.P. Kenna, and thereby erroneously discredited her

---

[3] Dr. Peppler's October 20, 2011 notes support the conclusion that Keels' back pain was relatively minor, stating "she does have low back pain, but she has predominantly pain in her knee radiating down to her leg to her foot and ankle."  [Tr. 283].

alleged psychological limitations. [11 at 21-22]. The ALJ noted that while Keels complained of panic attacks and crying spells, she did not undergo any psychiatric treatment beyond taking anti-depressant medication. [Tr. 16-17]. In her February 10, 2012 psychological examination, Keels reported experiencing depression, memory loss, and difficulty sleeping. [Tr. 315-18]. Kenna reported that Keels cried for much of the interview and was reluctant to leave home. [Tr. 317]. Kenna appears to have concluded that Keels would remain in that state, and thus, would be unable to perform any work. [*Id.*]. The ALJ properly concluded that this finding was inconsistent with the other medical evidence of record. [Tr. 17-18]. Among the numerous treatment records from Drs. Parker and Peppler, Keels is never described as constantly or even regularly crying. While the ALJ did not fully credit Keels' alleged psychological limitations, the RFC he applied does account for these impairments by limiting Keels to simple, concrete, two to three step routine and repetitive tasks with only brief and superficial interaction with others in the workplace. [Tr. 15]. Keels again fails to describe why these limitations are insufficient to account for her alleged limitations.

## III.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **[13]** be **DENIED**, Keels' Motion **[11]** be **GRANTED IN PART** to the extent it seeks remand, and **DENIED IN PART** to the extent that it seeks an award of benefits, and that, pursuant to 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation.

Dated: May 18, 2015                         s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                            United States Magistrate Judge

24

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 18, 2015.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager

25